IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:24-cv-00578-M-RN

| | |
|---|---|
| VIRGINIA WASSERBERG, NORTH CAROLINA REPUBLICAN PARTY, and REPUBLICAN NATIONAL COMMITTEE,<br><br>   Plaintiffs,<br><br>  v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS; ALAN HIRSCH, in his Official Capacity as the Chair of and a Member of the North Carolina State Board of Elections; JEFF CARMON, in his Official Capacity as the Secretary of and a member of the North Carolina State Board of Elections; KEVIN N. LEWIS, in his Official Capacity as a Member of the North Carolina State Board of Elections; SIOBHAN O'DUFFY MILLEN, in her Official Capacity as a Member of the North Carolina State Board of Elections, STACY "FOUR" EGGERS IV, in his Official Capacity as a Member of the North Carolina State Board of Elections, and KAREN BRINSON BELL, in her Official Capacity as Executive Director of the North Carolina State Board of Elections,<br><br>   Defendants,<br><br>and<br><br>NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS,<br><br>   Intervenor-Defendant. | **NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND** |

## INTRODUCTION

After the State Board of Elections refused to order county boards to reject absentee ballots securely sealed within an outer envelope, Plaintiffs sued in Wake County Superior Court seeking an order compelling the Board to reverse course and enforce state law to require disqualification of ballots unless the *inner* envelope also is sealed. The State Board subsequently removed to this Court pursuant to 28 U.S.C. § 1443(2), which permits state officers to remove a civil action brought against them "for refusing to do any act on the ground that it would be inconsistent with [a] law [providing for equal rights]." The action that Plaintiffs seek to compel, the State Board believes, would place the State Board in violation of the "materiality provision" of the 1964 Civil Rights Act, 52 U.S.C. § 10101(2)(B), which prohibits denying the right to vote based on paperwork errors that are not material to a voter's qualifications. Plaintiffs have now moved to remand this matter to state court, but each of their arguments for remand fails.

*First*, Plaintiffs' lawsuit charges the State Board with "refusing" to do an act that they allege is required by state law—rescinding existing guidance and directing county boards of election to reject absentee ballots when only the outer envelope is sealed. This litigation arose after the State Board refused to change its guidance or to instruct county boards to reject these ballots, based in part on its good faith belief that doing so would violate the materiality provision of the federal Civil Rights Act of 1964.

*Second*, contrary to Plaintiffs' approach, the ultimate merits of that defense are not before the Court in this motion. Instead, the Court must determine whether the State Board has asserted a *colorable* conflict between the action that Plaintiffs allege is required by state law and a federal law providing for equal rights—specifically, the materiality provision of the 1964 Civil Rights Act. Plaintiffs do not dispute that the relief they seek would require denying the right to vote by discarding absentee ballots based on errors that have no bearing on the voter's qualifications.

Instead, they rely on a nonbinding decision of a divided Third Circuit panel holding that the materiality provision applies only to voter registration and not to casting an absentee ballot. That decision departed drastically from the statute's plain text as well as the weight of federal case law interpreting the materiality provision. But even on its own terms, the Third Circuit's decision does not apply here. In North Carolina, unlike Pennsylvania, the absentee ballot return envelope serves as the "application" for an absentee ballot, bringing it squarely within the scope of the materiality provision's plain text.

*Third*, binding precedent establishes that the Civil Rights Act is a "law providing for equal rights" within the ambit of § 1443(2). And the materiality provision is a central component of that landmark civil rights law. As courts have long recognized, the materiality provision was necessary to combat racial discrimination in voting carried out through pretextual reliance on immaterial paperwork errors. That the materiality provision does not require a showing of racially discriminatory intent or effect does not change that fact.

The Court should deny the motion to remand.

## BACKGROUND

### I. The Board's Guidance

To vote an absentee ballot in North Carolina, voters must comply with six requirements before returning the ballot: they must (1) mark their ballot, (2) fold it, (3) "[p]lace the folded ballot[] in the container-return envelope and securely seal it," (4) complete an absentee ballot application and certificate, (5) obtain two witness signatures, and (6) have the application either notarized or certified by the witnesses. N.C.G.S. § 163-231(a).

Before 2023, absentee ballots in North Carolina were returned inside a single, sealed container-return envelope, the outside of which served as the absentee ballot application and had space for the required witness signatures and certificates. *See* N.C.G.S. §§ 163-231; 163-229(b).

In 2020, the State Board of Elections issued guidance that a ballot would not be counted if upon arrival at the county board of elections, the container-return envelope was unsealed, a witness or assistant did not sign, or the envelope indicated the voter requested a replacement ballot.[1]

In 2023, North Carolina enacted a new voter identification requirement, which requires an absentee voter to provide photo identification with their absentee ballot. N.C.G.S. § 163-230.1(f1). Accordingly, state law now requires the container-return envelope to include "[a]n area to attach additional documentation necessary to comply with the identification requirements." N.C.G.S. § 163-229(b)(8). However, voters' identification documents are confidential under state law and must be therefore protected from public view when ballots are mailed back to county election boards. *See* N.C.G.S. § 163-233(a). The implementation of the new voter identification requirement thus necessitated the addition of a second envelope so that a voter's identification paperwork could be submitted without being publicly revealed. The Board updated its guidance in September 2023 to clarify that ballots are "sealed in the container-return envelope" as long as either the outer return envelope or the inner application envelope is sealed. *See* Compl. Ex. A at 3–4 & n.9, ECF No. 1-4 at 5–6 ("Numbered Memo 2021-03") (quoting N.C.G.S. § 163-230.1(d)). As the Board subsequently explained, its primary rationale was that the "changes to the absentee-by-mail voting process [that] were required after the photo ID laws went into effect, . . . included a redesign to the container-return envelope so that it constituted two separate envelopes," such that sealing the ballot inside either the outer or inner envelope satisfied the statutory sealing requirements. Compl. Ex. C, N.C. State Bd. of Elections Declaratory Ruling at 15, ECF No. 1-4 at 41. Any other interpretation "would lead to some level of voter disenfranchisement" because of

---

[1] North Carolina State Board of Elections, Numbered Memo 2020-19, Absentee Container-Return Envelope Deficiencies at 3 (Aug. 21, 2020), available at perma.cc/V3WE-LZC2 ("Numbered Memo 2020-19").

the reasonable possibility that voters would not understand that both inner and outer envelopes must be sealed. *Id.* at 16. The Board also explained that strictly enforcing a requirement for a voter to seal their ballot in the application envelope when the ballot and application envelope are nonetheless sealed within an outer envelope, and the voter is otherwise qualified to vote, would violate the materiality provision of the Civil Rights Act. *Id.* at 18.

## II. Plaintiffs' Action

On May 20, 2024—eight months after the Board issued its guidance—Plaintiffs the North Carolina Republican Party, the Republican National Committee, and Virginia Wasserberg requested a Declaratory Ruling from the Board seeking reversal of this enforcement guidance. *Id.* at 1. On July 29, 2024, the Board unanimously concluded "that the instruction at issue in Numbered Memo 2021-03 pertaining to how county boards must address a ballot that is sealed in the return envelope rather than sealed in the ballot envelope is the correct application of the law." *Id.* at 2.

On September 4, 2024, Plaintiffs filed this action challenging the Board's guidance and seeking declaratory and injunctive relief that would require the Board to instruct county boards of elections to reject ballots delivered in sealed outer envelopes unless the inner envelope also is sealed. Compl. ¶¶ 60–61, [ECF No. 1-3](). In support of their claim, Plaintiffs specifically allege that ballots are not "sealed in the container-return envelope," N.C.G.S. § 163-230.1(d), when only the outer envelope is sealed because that outer envelope does not meet the absentee ballot application requirements outlined in § 163-229(b). Compl. ¶ 28, [ECF No. 1-3](). On October 9, 2024, the Board removed the case to this Court under 28 U.S.C. § 1443(2). Plaintiffs subsequently moved to remand.

## ARGUMENT

This case centers on Plaintiffs' demand that the Board enforce N.C.G.S. § 163-231(a)(3) in such a manner as to require the rejection of ballots that are sealed within what they claim is the

"wrong" envelope, even when the "right" envelope is inside. The Board refuses to do so, based in part on the Board's good-faith belief that enforcing § 163-231(a) according to Plaintiffs' interpretation would violate the materiality provision of the Civil Rights Act. *See* Compl. Ex. C at 21, ECF No. 1-4 at 47. That refusal is sufficient to establish federal subject-matter jurisdiction under 28 U.S.C. § 1443(2), which is commonly referred to as the "Refusal Clause." *See Alonzo v. City of Corpus Christi*, 68 F.3d 944, 946 (5th Cir. 1995) (recognizing state officials may remove under § 1443(2) when defending their "refusal to follow plaintiff's interpretation of state law because of a good faith belief that to do so would violate federal law").

I. **Plaintiffs are suing the State Board for refusing to enforce Plaintiffs' interpretation of state law.**

Plaintiffs correctly identify that for state officers, "the Refusal Clause authorizes removal only where the defendant is sued 'for refusing to do any act,' or where the alleged unlawful conduct from which a plaintiff seeks relief is an affirmative refusal to enforce state laws," Memorandum of Law in Support of Motion to Remand at 9 ("Br."), ECF No. 17, but they rely on inapposite authority to claim that standard is not met here. Under North Carolina law, the State Board of Elections is an independent agency charged with appointing "all members of the county boards of elections," "advis[ing] them as to the proper methods of conducting primaries and elections," and "compel[ling] observance of the requirements of the election laws by county boards of elections and other election officers." N.C.G.S. §§ 163-28, 163-22(c). Pursuant to these obligations, the Board issued Numbered Memo 2021-03, which instructed county boards not to reject ballots as deficient if only one of the ballot envelopes is sealed. *See* Compl. Ex. A at 4, ECF No. 1-4 at 6. Plaintiffs subsequently asked the Board to rescind or revise the relevant portions of Numbered Memo 2021-03 and to instead enforce § 163-231(a)(3) by instructing county boards to reject ballots if only the outer envelope is sealed, even where the voter has otherwise complied with the

- 6 -
Case 5:24-cv-00578-M-RN   Document 29   Filed 10/21/24   Page 6 of 18

requirements establishing their voting eligibility and identity. *See* Compl. at 15, ECF No. 1-3. The Board refused to rescind the Memo or to enforce the sealing requirement according to Plaintiffs' interpretation; Plaintiffs consequently have sued to compel these results. *See id.* at 16. That satisfies the refusal requirement of § 1443(2).

None of the cases Plaintiffs cite is to the contrary. *Common Cause v. Lewis* involved a challenge to the General Assembly's adoption of redistricting plans, which is a legislative act not subject to § 1443(2). *See* 956 F.3d 246, 252 (4th Cir. 2020); *see also* 358 F. Supp. 3d 505 (E.D.N.C. 2019) ("*Common Cause I*"). The Sixth Circuit in *Detroit Police Lieutenants & Sergeants Ass'n v. City of Detroit* did not specifically address the "refusal" prong at all, instead noting that plaintiffs (rather than defendants) alleged civil rights violations. 597 F.2d 566, 568 (6th Cir. 1979). *City & County of San Franscisco v. Civil Service Commission* challenged the reinstatement of an employee rather than—as here—the "refusal by the [defendant] to enforce the law" in the manner preferred by the plaintiffs. No. C 02–03462 WHA, 2002 WL 1677711, at *4 (N.D. Cal. July 24, 2002). And *Massachusetts Council of Construction Employers, Inc. v. White* involved the issuance of executive orders rather than a dispute over how the law should be enforced. 495 F. Supp. 220, 222 (D. Mass. 1980). Unlike those cases, the core dispute here is that Plaintiffs believe the law requires disqualification of certain ballots—and Defendants refuse to disqualify those ballots.

## II. The State Board asserted a colorable conflict between Plaintiffs' requested relief and the Civil Rights Act.

The plain text of the Refusal Clause further confirms that removal is proper here because of the colorable conflict between Plaintiffs' interpretation of state law and the materiality provision of the Civil Rights Act. As discussed, § 1443(2) states that removal is warranted where a defendant is being sued for their "refus[al] to do any act on the ground that it would be inconsistent with [federal civil rights law]." 28 U.S.C. § 1443(2). That is precisely what happened here: the State

Board refused to follow Plaintiffs' interpretation of § 163-231(a)(3) because of its good faith belief that doing so would violate the materiality provision. Under the plain terms of the Refusal Clause, removal is thus proper.

### A. Plaintiffs apply the wrong standard for demonstrating an inconsistency with federal law.

Plaintiffs seek to raise the Board's burden by asserting it must demonstrate a "square and definite" inconsistency between state and federal law. Br. at 12. But that is not what the law says. Instead, "[i]t requires only that the defendants' refusal to act was 'on the ground' that acting would be inconsistent with federal law." *Bridgeport Ed. Ass'n v. Zinner*, 415 F. Supp. 715, 722–23 (D. Conn. 1976) (quoting 28 U.S.C. § 1443(2)). There is no requirement that a defendant *prove* an inconsistency before removing the case. Rather, the "jurisdictional touchstone" of the Refusal Clause is "a *colorable* conflict between state and federal law leading to the removing defendant's refusal to follow plaintiff's interpretation of state law because of a *good faith belief* that to do so would violate federal law." *White v. Wellington*, 627 F.2d 582, 586–87 (2d Cir. 1980) (emphasis added, quotation marks omitted). Tellingly, Plaintiffs rely exclusively on a single out-of-circuit district court opinion from 1979 for their contrary position. But that decision is an outlier among the great weight of federal authority adopting the colorable conflict standard. *See, e.g.*, *Alonzo*, 68 F.3d at 946; *Greenberg v. Veteran*, 889 F.2d 418, 421 (2d Cir. 1989); *Cavanagh v. Brock*, 577 F. Supp. 176, 180 (E.D.N.C. 1983); *Suttlar v. Thurston*, No. 4:22-CV-00368 KGB, 2022 WL 2713648, at *5 (E.D. Ark. July 13, 2022); *Zinner*, 415 F. Supp. at 722–23; *City & Cnty. of San Francisco*, 2002 WL 1677711, at *4; *Cappitelli v. Hoskins*, No. 88 C 5075, 1988 WL 96347, at *3 (N.D. Ill. Sept. 9, 1988)).

The "colorable conflict" standard is also consistent with the purpose of the Refusal Clause in providing a federal forum to litigate potential clashes between state and federal law. *See Detroit*

*Police Lieutenants & Sergeants Ass'n*, 597 F.2d at 568. By contrast, the heightened standard Plaintiffs urge this Court to adopt would shut the federal courthouse doors on state officers who have a good faith belief that they are being asked to violate federal law unless they can prove their case at the threshold. This case illustrates the problem. Plaintiffs seek to force this Court to decide at the earliest stage of this litigation whether Plaintiffs' interpretation of § 163-231(a)(3) is "definite[ly] inconsisten[t]" with the materiality provision. Br. at 12; *see also id.* at 13–14 (arguing the merits of the materiality provision issue). But to do so would make "entitlement to removal depend on whether the defendants will prevail on the merits of their claim," which federal courts have refused to do. *Zinner*, 415 F. Supp. at 722; *cf. Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (rejecting "a narrow, grudging interpretation" of the federal officer removal statute, and holding that that a federal officer is only required to "raise a colorable federal defense," and not "virtually to win his case before he can have it removed").

The colorable conflict standard does not unjustifiably broaden the Refusal Clause, as Plaintiffs suggest. Br. at 12. To remove a case under § 1443(2), the defendant must have a *good faith belief* that following the plaintiff's interpretation of state law would violate federal law, which is tested objectively. *White*, 627 F.2d at 587; *see also Taylor v. Currie*, 386 F. Supp. 2d 929, 937 (E.D. Mich. 2005) (remanding case to state court when defendant's subjective belief of conflict between state court injunction and federal voting rights law was objectively unreasonable).[2] Thus,

---

[2] Plaintiffs' attempt to compare this case to *Taylor v. Currie* is badly strained. In *Taylor*, the defendants removed a case after the state court enjoined them from mailing out unsolicited absentee ballot applications to Detroit voters, arguing the injunction required them to violate the Voting Rights Act. 386 F. Supp. 2d at 935. The federal court remanded the case, finding no connection between the VRA and the state court's injunction and noting that the timing of removal suggested defendants inappropriately sought "to remove in order to ask [the federal court] to find that [the state court's injunction] was in error." *Id.* at 936-38. By contrast, here, the State Board has consistently and specifically explained the direct clash between Plaintiffs' requested relief and

the Refusal Clause requires more than a "'vaguely defined claim' that a state official's actions would 'be inconsistent with'" federal civil rights law, *id.* at 937, but grants federal courts jurisdiction to decide "subtle cases . . . where it is most appropriate for the difficult issue of the availability of the asserted federal defense to be decided by a federal court." *Zinner*, 415 F. Supp. at 723.

### B. There is a colorable conflict between Plaintiffs' requested relief and the materiality provision.

The State Board has established a colorable conflict based on its objectively reasonable belief that Plaintiffs' requested relief would violate the materiality provision. The elements of a materiality provision claim are (1) the denial of any individual's right to vote, (2) because of an error or omission on any paper relating to an application or other act requisite to voting, (3) where such error or omission is not material in determining whether an individual is qualified to vote under state law. 52 U.S.C. § 10101(a)(2)(B). As the Board has explained, enforcing N.C.G.S. § 163-231(a)(3) according to Plaintiffs' view of the law would require election officials to cast aside a qualified voter's ballot solely because it is returned in a sealed envelope that does not contain the ballot application on the *outside*, even though a completed application is placed *inside* and contains all statutory requirements for establishing a voter's eligibility and identity—precisely the type of "immaterial error" on paperwork requisite to voting that the materiality provision guards against. *See* Compl. Ex. C at 17-18, ECF No. 1-4 at 43–44 (explanation of materiality provision conflict); Memorandum of Law in Support of Motion to Dismiss 16-18, ECF No. 22 (explanation that Numbered Memo 2021-03's guidance is necessary to ensure that county boards of elections comply with the materiality provision).

---

the materiality provision, *see* Compl. Ex. C at 17-18, ECF No. 1-4 at 43–44, and they do not seek this Court's jurisdiction to overturn any state court decision.

Plaintiffs do not seriously dispute that their requested relief would result in the denial of individuals' right to vote, nor do they even attempt to argue that requiring the absentee ballot application to appear on the sealed outer envelope—when a completed application envelope is otherwise placed inside—is material in determining an individual's qualifications to vote under state law. Instead, they rely on a recent Third Circuit opinion where a divided panel held that the materiality provision applies only during "the voter qualification [or registration] process"—a view no other circuit has adopted. *Pennsylvania State Conf. of NAACP Branches v. Sec. of Commonwealth of Pennsylvania*, 97 F.4th 120, 133 (3d Cir. 2024) ("*Pa. NAACP*"). But that sole non-binding case does not mean that this Court will or should reach the same conclusion.

Quite to the contrary, the plain text of the Civil Rights Act and the weight of authority both weigh strongly in favor of the Board's interpretation of the materiality provision—that it covers any circumstance under which a state denies the right to vote because of a voter's error or omission on any paper relating to an application or other act requisite to voting, where such error or omission is not material in determining whether an individual is qualified to vote under state law. *See, e.g.*, *La Unión del Pueblo Entero v. Abbott*, 705 F. Supp. 3d 725, 5757 (W.D. Tex. 2023) ("*LUPE*") (concluding that the materiality provision applies to the preparation of a carrier envelope because it is an "act requisite to voting" for individuals who cast a mail ballot), *stayed pending appeal sub nom. United States v. Paxton*, No. 23-50885 (5th Cir. Dec. 15, 2023); *In re Georgia Senate Bill 202*, No. 1:21-mi-55555, 2023 WL 5334582, at *10 (N.D. Ga. Aug. 18, 2023) (rejecting argument that the materiality provision did not apply to absentee ballot envelope requirements); *Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1338 (N.D. Ga 2023) (rejecting argument that the materiality provision did not apply to absentee ballot applications); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308–09 (N.D. Ga. 2018) (holding requirement to include birth year on absentee

ballot envelope likely violates materiality provision because "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope is not material to determining said voter's qualifications under Georgia law"); *League of Women Voters of Arkansas v. Thurston*, No. 5:20-cv-05174, 2023 WL 6446015, at *16 (W.D. Ark. Sept. 29, 2023) (applying the materiality provision to absentee ballot applications); *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021) (observing that the materiality provision "isn't limited to . . . voter registration"); *Ford v. Tenn. Senate*, No. 06-2031 D V, 2006 WL 8435145, at *7, 10-11 (W.D. Tenn. Feb. 1, 2006) (holding materiality provision prohibits state officials from refusing to count in-person voters' ballots because they had not met the requirement to separately sign both a ballot application form and a poll book).

Each of these decisions faithfully applies the materiality provision's plain text. As the court in *LUPE* explained, if the materiality provision "was intended only to protect qualified voters' right to register and be added to the voter rolls and not their right to actually cast a ballot and have it counted, Congress could have said so." *LUPE*, 705 F. Supp. 3d at 756. Instead, Congress "did just the opposite" by broadly defining the right to vote. *Id.*; *see also Pa. NAACP*, 97 F.4th at 147 (Shwartz, J., dissenting) ("Had Congress wished to limit [the materiality provision] to registration-related conduct alone, it could have . . . defined 'vote' more narrowly, but it did not.").

In contrast, the *Pa. NAACP* majority made at least two major textual errors. It adopted a reading that, by the panel's own admission, renders the phrase "other act requisite to voting" superfluous. *See* 97 F.4th at 138. And it disregarded the "expansive[]" definition of the term "vote" in the Civil Rights Act. *Senate Bill 202*, 2023 WL 5334582, at *9. Congress defined "vote" as "all action necessary to make a vote effective including . . . casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(a)(3)(A), (e). Successfully completing an absentee ballot application

and preparing the ballot return envelope are colorably (if not plainly) acts "requisite to voting." *Id.* § 10101(a)(2)(B). "Congress explicitly defined the operative term"—here, "vote"—in the materiality provision, *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 697 n.10 (1995), regardless of any invented meaning the panel majority in *Pa. NAACP* felt could distinguish the "voter qualification process" from the "vote-casting stage," *Pa. NAACP*, 97 F.4th at 133.

Even putting aside *Pa. NAACP*'s conflict with the statutory text and weight of authority, there are also key differences between the situation here and the one presented to the Third Circuit. In *Pa. NAACP*, "[e]veryone agree[d]" that the absentee ballot envelope did not "relate to applying or registering to vote," so the Third Circuit had to parse whether completing it was an "act requisite to voting" under the materiality provision. *Id.* at 131. But in North Carolina, the ballot envelope serves as an "application" to vote absentee. N.C.G.S. §§ 163-229(b); 163-230.1(e), (f). And the thrust of Plaintiffs' Complaint is that a ballot sealed within the outer envelope should not count because the outer envelope does not include the information or certifications required by N.C.G.S. § 163-229(b)—which provides that the application must be printed on the container-envelope. *See* Compl. ¶ 47, ECF No. 1-3; *id.* at p. 16. Because the plain text of the materiality provision applies to paperwork "relating to any *application*, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B) (emphasis added), there is a colorable argument that the materiality provision applies to errors or omissions on absentee ballot envelopes in North Carolina.

Indeed, Plaintiffs *do not dispute* the Board's good faith belief that their requested relief would conflict with the materiality provision. Instead, they invite the Court to jettison that applicable standard to reach their desired outcome. But given the plain text of the materiality provision and the extensive federal case law applying it outside the voter registration context—

including in the specific circumstance of preparing an absentee ballot envelope—the Board's belief that Plaintiffs' requested relief would conflict with the provision is objectively reasonable. *See White*, 627 F.2d at 587. Thus, the Board has alleged a colorable conflict between state and federal law, and removal under the Refusal Clause is proper.

### C. The materiality provision was enacted to prohibit racial discrimination.

Plaintiffs' argument that the materiality provision is not an anti-discrimination statute ignores the well-documented history of the provision and the reasons for its enactment. The Refusal Clause applies broadly to "any law providing for equal rights." 28 U.S.C. § 1443(2). Though the Supreme Court has limited the meaning of this phrase to include only federal statutes "concerning racial equality," *Vlaming v. W. Point Sch. Bd.*, 10 F.4th 300, 309 (4th Cir. 2021), the materiality provision is such a statute. It was first enacted as part of the Civil Rights Act of 1964 to eliminate arbitrary and discriminatory barriers to voting in federal elections, *see* Pub. L. No. 88-352, § 101, 78 Stat. 241, 241 (1964), and later expanded through the 1965 Voting Rights Act, Pub. L. No. 89-110, § 15(a), 79 Stat. 437, 445 (1965). It is codified at 52 U.S.C. § 10101(a)(2)(B), under a heading titled "Race, color or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions form papers; literacy tests; agreements between Attorney general and State or local authorities; definitions."

The materiality provision, though it protects all voters from disenfranchisement due to immaterial paperwork errors, was enacted to address pernicious forms of *racial* discrimination in voting. "The measure was at the time the latest entry in a spurt of federal enforcement of voting rights after a long slumber following syncopated efforts during Reconstruction." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008). It was enacted after "[s]tatutes enacted in 1870, 1871, 1957, and 1960 had all been unsuccessful attempts to counteract state and local government tactics of using, among other things, burdensome registration requirements to

disenfranchise African-Americans." *Id.* The materiality provision was thus "necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age." *Id.* (quoting *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995)).

In light of this history, courts have long recognized that the materiality provision "is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements." *McKay v. Altobello*, No. CIV. A. 96-3458, 1996 WL 635987, at *1 (E.D. La. Oct. 31, 1996); *see also Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 & n.106 (S.D. Ind. 2006) ("[W]ell-settled law establishes that § 1971 was enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." (collecting cases)); *Thomsen*, 574 F. Supp. 3d at 636 (same); *Browning*, 533 F.3d at 1181 ("Congress recognized in passing the VRA that discriminatory registration requirements are more sophisticated and pernicious than simply asking applicants for immaterial information. Its concern was not merely with overtly discriminatory requirements that ask for irrelevant information, but also with requirements that ask for relevant information but disproportionately penalize applicants for trivial mistakes." (Barkett, J., concurring)). The materiality provision is therefore unquestionably a law "concerning racial equality." *Vlaming*, 10 F.4th at 309 (4th Cir. 2021).

None of the cases relied upon by the Plaintiffs says otherwise. In *Common Cause I*, the district court explained that "the privilege of removal is conferred . . . *only* upon state officers who refuse *to enforce* state laws discriminating on account of race or color." 358 F. Supp. 3d at 511 (quoting *Burns v. Bd. of Sch. Comm'rs of City of Indianapolis*, 302 F. Supp. 309, 311-12 (S.D. Ind. 1969)) (emphasis in *Common Cause I*). The Court cited this language in support of its holding that "plaintiffs' action is not removable by the Legislative Defendants because they have only a

legislative role, rather than a law enforcement role." *Id.* It did not purport to limit the application of the Refusal Clause to refusals to enforce facially discriminatory state laws. In *City and County of San Francisco*, the notice of removal relied upon the Due Process Clause and drew no connection between the removed case and racial discrimination. 2002 WL 1677711, at *6. In *Taylor v. Currie*, the Defendants asserted "a general reliance on the Voting Rights Act," but identified "no direct or immediate clash of duties between federal and state law." 386 F. Supp. 2d at 937. In other words, the court held that defendants had failed to identify a colorable federal law issue, not that the Voting Rights Act was not a "law providing for equal rights." 28 U.S.C. § 1443(2); *cf. O'Keefe v. N.Y.C. Bd. of Elections*, 246 F. Supp. 978, 980 (S.D.N.Y. 1965) (holding that the Voting Rights Act is "a law providing for equal rights" under Section 1443). And finally, in *People of the State of New York v. Horelick*, the court said—with respect to § 1443(2)—only that "petitioners have not pointed to any federal equal rights law" with which the activity for which they were being prosecuted "would be inconsistent." 424 F.2d 697, 703 (2d Cir. 1970).[3] None of these cases establishes that the Refusal Clause *requires* a "racially discriminatory result." Br. at 15.

This Court recently rejected the argument that the materiality provision falls within the purview of § 1443(2) on grounds that the Supreme Court in *Georgia v. Rachel*, 384 U.S. 780, 792 (1966), limited § 1443(2) to statutory provisions that explicitly referenced racial equality. *See* Order, *Republican Nat'l Comm. et al., v. N.C. State Bd. of Elections, et al.*, Case No. 5:24-CV-00547 at 35-36 (E.D.N.C. Oct. 17, 2024) ("*RNC*"). Respectfully, that is a misreading of the Supreme Court's decision in that case. In determining that § 1443(2) applies only to "law[s]

---

[3] The removing defendants in *Horelick* were teachers who were prosecuted for criminal trespass after they entered school grounds to protest racial segregation in schools during a strike. 424 F.2d at 699.

providing for specific civil rights stated in terms of racial equality," the Supreme Court *explicitly recognized* the Civil Rights Act of 1964 as such a law: although the First and Fourteenth Amendments were not sufficient, the Court observed that "the defendants in the present case did not rely solely on these broad constitutional claims in their removal petition," but instead "also made allegations calling into play the Civil Rights Act of 1964," which "is clearly a law conferring a specific right of racial equality." 384 U.S. at 792.

The Fourth Circuit's decision in *Vlaming* further supports this interpretation. There, the Fourth Circuit rejected the argument that § 1443(2) applied to actions involving Title IX because "[p]recedent . . . precludes Title IX from being the type of 'law providing for equal rights' referenced in § 1443(2)." 10 F.4th at 309. As that Court recognized, Title IX prohibits discrimination on the basis of sex, 20 U.S.C. § 1681; it therefore is not a law "addressing racial equality," *Vlaming*, 10 F.4th at 310. The Fourth Circuit reiterated, however, that the Supreme Court held in *Rachel* that "[The Civil Rights Act of 1964] is clearly a law conferring a specific right of racial equality." *Id.* at 309–10; *see also id.* at 310 n.4 ("The Civil Rights Act of 1964 was passed after the Court granted certiorari in *Rachel* but before the case was decided. The Court held that this statute, because of its racial equality protections . . . could serve as a basis of removal.").

The out-of-circuit Fair Housing Act cases cited by this Court in *RNC* are inapposite; unlike the Fair Housing Act, the Civil Rights Act of 1964 has been recognized by both the Supreme Court and the Fourth Circuit as a "law providing for equal rights" within the meaning of § 1443, and neither Court has required further parsing. That determination is both binding on this Court and consistent with extensive case law identifying the materiality provision as a law intended to protect against racial discrimination. *See supra*.

- 17 -
Case 5:24-cv-00578-M-RN   Document 29   Filed 10/21/24   Page 17 of 18

## CONCLUSION

Plaintiffs' Motion to Remand should be denied.

Dated: October 21, 2024

Respectfully submitted,

/s/ Narendra K. Ghosh
Narendra K. Ghosh, N.C. Bar No. 37649
**PATTERSON HARKAVY LLP**
100 Europa Drive, Suite 420
Chapel Hill, NC 27217
Telephone: (919) 942-5200
nghosh@pathlaw.com

*Local Civil Rule 83.1(d) Attorney for Intervenor-Defendant*

Uzoma Nkwonta, D.C. Bar No. 975323
Justin Baxenberg, D.C. Bar No. 1034258
Richard A. Medina, D.C. Bar No. 90003752*
Julie Zuckerbrod, D.C. Bar No 1781133
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
unkwonta@elias.law
jbaxenberg@elias.law
rmedina@elias.law
jzuckerbrod@elias.law

*Notice of Special Appearance forthcoming
*Attorneys for Intervenor Defendant*