IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00578-M

VIRGINIA WASSERBERG, NORTH
CAROLINA REPUBLICAN PARTY,
and REPUBLICAN NATIONAL
COMMITTEE,

        Plaintiffs,

    v.

NORTH CAROLINA STATE BOARD
OF ELECTIONS, et al.,

        Defendants,

     and

NORTH CAROLINA ALLIANCE FOR
RETIRED AMERICANS,

        Intervenor-Defendant.

**PLAINTIFFS' RESPONSE TO
DEFENDANTS'
MOTION TO DISMISS**

## INTRODUCTION

The North Carolina General Assembly has enacted several laws intended to prevent tampering with absentee ballots by requiring that absentee voters seal their ballots in container-return envelopes before submitting the ballots to county boards of elections. The North Carolina State Board of Elections (the "NCSBE" or the "Board") has advised the county boards that they may disregard the clear requirements of those laws and count absentee ballots that are not returned in sealed container-return envelopes. Plaintiffs filed this lawsuit to stop the NCSBE from disregarding the unambiguous requirements of North Carolina law.

The NCSBE has filed a motion to dismiss this case,[1] arguing that the Board has done nothing wrong. The NCSBE makes two arguments in support of its motion. First, it claims that the state absentee-voting laws do not mean what they say. Second, the NCSBE claims that federal law prevents it from enforcing the state law. But just as it has misinterpreted state law, the NCSBE also has misinterpreted federal law. Therefore, the Court should reject the NCSBE's incorrect interpretations of state and federal law and deny the motion to dismiss.

<u>BACKGROUND</u>

## I. __Under North Carolina law, mail-in absentee ballots must be submitted in sealed container-return envelopes.__

Properly registered voters may vote absentee by mail in North Carolina. State law allows a voter to request absentee ballots from his or her county board of elections. N.C. Gen. Stat. § 163-230.1. The county board must then mail certain items to the voter, including absentee ballots and a special container-return envelope, which meets specific statutory requirements and in which marked ballots must be returned. *Id*. § 163-230.1(a)(1)-(4).

The county board is required to print an application on the outside of the container-return envelope that must include several things. *Id*. § 163-229(b). Among other things, it must include a certification, to be completed by the absentee voter, certifying that he or she voted the ballot that is, in fact, enclosed in the container-return envelope. *Id.* § 163-229(b)(1). It also must include a space for the names,

---

[1] The Motion to Dismiss [D.E. 21] was filed by the Defendants—whom Plaintiffs will refer to collectively as the "NCSBE" or the "Board" in this memorandum of law.

signatures, and addresses of two witnesses or one notary public who witnessed the voter casting the ballot enclosed in the container-return envelope. *Id.* § 163-229(b)(3); *id.* § 163-231(a)(6). After marking the absentee ballot, the voter must submit it to the county board in the container-return envelope. *Id.* § 163-231(b).

Several North Carolina General Statutes specifically require that the container-return envelope must be sealed before absentee ballots are returned to, and counted by, a county board of elections:

a. N.C. Gen. Stat. § 163-231(a)(3) requires that the voter must place his or her "folded ballots ***in the container-return envelope and securely seal it*** or have this done in the voter's presence." (Emphasis added.)

b. Similarly, N.C. Gen. Stat. § 163-230.1(d) specifically provides that an application for an absentee ballot "shall be completed and signed by the voter personally, the ballots marked, the ballots ***sealed in the container-return envelope***, and the certificate [on the sealed container-return envelope] completed as provided in G.S. 163-231." (Emphasis added.)

c. N.C. Gen. Stat. § 163-231(a) provides directions for transmitting "***the sealed container-return envelope***, with the ballots enclosed," to the appropriate county board of elections. (Emphasis added.)

d. N.C. Gen. Stat. § 163-231(b) describes in detail how "***[t]he sealed container-return envelope*** in which executed absentee ballots have

been placed shall be transmitted to the county board of elections who issued those ballots." (Emphasis added.)

For ease of reference, this memorandum will refer to these statutes governing container-return envelopes as the "CRE Statutes."

## II.      The NCSBE has provided directions to county boards of elections that directly contradict the CRE Statutes.

On June 11, 2021, the NCSBE issued Numbered Memo 2021-03 (the "Numbered Memo"). (Complaint & Petition ("Complaint") [D.E. 1-3] ¶ 29.)[2] As the NCSBE notes in its memorandum in support of the motion to dismiss (the "NCSBE Mem." [D.E. 22]), the NCSBE revised the Numbered Memo in January 2024. (NCSBE Mem. at 7; *see also* Numbered Memo [D.E. 1-4 page 3 n.2].) Following that revision, the Numbered Memo incorrectly advised North Carolina county boards of elections that they could count an absentee ballot even if it was returned in an unsealed container-return envelope (which the NCSBE referred to as a "ballot envelope," rather than using the statutory term "container-return envelope"), so long as the unsealed container-return envelope was returned in some other, larger envelope that had been sealed. (D.E. 1-4 pages 5 to 6.)

On May 20, 2024—nearly five months ago—Plaintiffs submitted a request[3] to the NCSBE for a declaratory ruling pursuant to N.C. Gen. Stat. § 150B-4.

---

[2] Upon removing this case to this Court, Defendants filed Plaintiffs' Complaint and Petition (the "Complaint") as D.E. 1-3 and filed all exhibits to the Complaint as D.E. 1-4.  Defendants filed the Numbered Memo (Exhibit A to the Complaint) as pages 3 to 15 of D.E. 1-4.

[3] Filed as Exhibit B to the Complaint and pages 17 to 25 of D.E. 1-4.

4

(Complaint, ¶ 36.) Plaintiffs notified the NCSBE of the flaws in the Numbered Memo's instructions about the counting of absentee ballots returned in unsealed container-return envelopes. (D.E. 1-4 pages 18 to 22.)

On August 2, 2024, the NCSBE issued its declaratory ruling[4] in response to Plaintiffs' request (the "Declaratory Ruling"). (Complaint, ¶ 39.) Once again using the term "ballot envelope" rather than the correct statutory term "container-return envelope," the Declaratory Ruling erroneously declared, among other things, that:

> the instruction at issue in Numbered Memo 2021-03 pertaining to how county boards must address a ballot that is sealed in the return envelope rather than sealed in the ballot envelope is the correct application of the law.

(D.E. 1-4 page 49.)

Plaintiffs responded by filing this action on September 3, 2024. In this case, Plaintiffs sought, pursuant to the North Carolina Administrative Procedures Act, judicial review and reversal of the Declaratory Ruling's decision concerning application of the CRE Statutes. (Complaint, ¶¶ 54, 60 & Prayer for Relief ¶ A.) Plaintiffs alternatively sought a declaratory judgment under the North Carolina Declaratory Judgment Act declaring in part that, to be counted, an absentee ballot must, among other things, be received by a county board of elections in a sealed container-return envelope. (Complaint, ¶¶ 54, 60.b. & Prayer for Relief ¶ A.2.) Plaintiffs also requested injunctive relief to ensure that the NCSBE implemented the court's rulings. (Complaint, ¶ 61 & Prayer for Relief ¶ B.)

---

[4] Filed as Exhibit C to the Complaint and pages 27 to 50 of D.E. 1-4.

On September 24, a group calling itself the "North Carolina Alliance for Retired Americans" (the "NCARA") filed a Motion to Intervene in this action. (D.E. 1-13.) The NCSBE then removed this case to this Court on October 9. (D.E. 1.) In a text-only order entered on October 16, the Court granted the NCARA's Motion to Intervene. The NCSBE then filed the Motion to Dismiss presently pending before the Court on October 16. (D.E. 21.) The NCARA filed a "Joinder to Defendants' Motion to Dismiss" on November 6. (D.E. 41.)

<u>**ARGUMENT**</u>

## I.   <u>Plaintiffs' Claims for Relief</u>

### A.   <u>The North Carolina Administrative Procedures Act</u>

The North Carolina Administrative Procedures Act (the "APA") allows aggrieved parties like Plaintiffs who have sought a declaratory ruling from the NCSBE to then obtain judicial review of that ruling. *See* N.C. Gen. Stat. § 150B-4(a)(3); *id.* §§ 150B-43, et seq. The APA provides in part that, "the court reviewing a final decision" of a North Carolina administrative agency like the NCSBE

> may . . . reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are: . . . (2) In excess of the statutory authority or jurisdiction of the agency . . . ; [or] (4) Affected by other error of law . . . .

*Id.* § 150B-51(b)(2), (4).

The NCSBE is a creature of statute. *See id.* § 163-19. The General Assembly has given the Board "general supervision over the primaries and elections in the State" and the "authority to make such reasonable rules and regulations with respect to the conduct of primaries and elections as it may deem advisable." *Id.* § 163-22(a).

6

But nothing gives the NCSBE the power to advise, instruct, direct, or guide county boards of elections to disregard North Carolina General Statutes. Indeed, the NCSBE is prohibited from doing so. *See State ex rel. Comm'r of Ins. v. Integon Life Ins. Co.,* 28 N.C. App. 7, 11, 220 S.E.2d 409, 412 (1975) ("An administrative agency has no power to promulgate rules and regulations which alter or add to the law it was set up to administer or which have the effect of substantive law."); *see also* N.C. Gen. Stat. § 163-22(a) (providing that the NCSBE can promulgate "reasonable rules and regulations" but only "so long as they do not conflict with any provisions of this Chapter"—i.e., Chapter 163 of the North Carolina General Statutes).

Because the NCSBE has issued a Declaratory Ruling that conflicts with the plain language of several statutes in Chapter 163 of the North Carolina General Statutes, the Board has exceeded its legal authority. Consequently, the Declaratory Ruling should be reversed pursuant to N.C. Gen. Stat. § 150B-51(b)(2). As the Declaratory Ruling is based on a misinterpretation of North Carolina law, it is affected by an error of law and also should be reversed pursuant to § 150B-51(b)(4).

**B.    Declaratory Judgment**

If the Court holds that the APA for some reason does not apply, Plaintiffs are entitled to the declaratory judgment requested in their Complaint.

The North Carolina Declaratory Judgment Act provides in part that, "[a]ny person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." N.C. Gen. Stat. § 1-254. The federal Declaratory Judgment Act similarly

7

provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57; *American President Lines v. Mackey*, 120 F. Supp 897, 898 (D.D.C. 1953) (discussing use of declaratory judgments to review actions of government agencies); *Electronic Privacy Info. Ctr. v. Nat. Security Comm'n on Artificial Intelligence*, 466 F. Supp. 3d 100, 123 (D.D.C. 2020) (discussing use of declaratory judgments to review actions of other government-related entities).

In this case, there is an actual, real, presently existing, concrete, and justiciable controversy between Plaintiffs and the NCSBE regarding, among other things, the NCSBE's erroneous interpretation of the CRE Statutes. Plaintiffs are entitled to a declaratory judgment that resolves the dispute by declaring:

    a. The only type of envelope that qualifies as a container-return envelope under the North Carolina General Statutes is an envelope that satisfies all of N.C. Gen. Stat. § 163-229(b)'s requirements; and

    b. To be counted, an absentee ballot must (i) be received by a county board of elections in a sealed container-return envelope and (ii) meet all other requirements imposed by the North Carolina General Statutes for valid absentee ballots.

(Complaint ¶ 60 & Prayer for Relief ¶ A.)

## C. <u>Injunctive Relief</u>

Finally, Plaintiffs have requested injunctive relief to implement any ruling under the APA or the declaratory judgment. Specifically, Plaintiffs have requested that the Court order the NCSBE to notify the county boards of elections of the Court's

ruling and to rescind or delete all parts of the Numbered Memo that are inconsistent with the Court's ruling. (Complaint ¶ 61 & Prayer for Relief ¶ B.)[5]

## II.    The NCSBE's interpretation of the CRE Statutes is wrong.

### A.    The CRE Statutes plainly require that an absentee voter must seal *the* container-return envelope or have it sealed in his or her presence before submitting it to a county board of elections.

Notwithstanding the CRE Statutes' plain language to the contrary, the NCSBE argues that an absentee voter can satisfy the statutes by sealing some other outer envelope, rather than a container-return envelope. (NCSBE Mem. at 14 ("[I]f a ballot is received in an unsealed, inner ballot envelope, but the ballot envelope is inside a sealed outer, return envelope, that ballot is not deficient.").) Nowhere, however, do the General Statutes permit such a practice. Instead, the statutes concerning sealing specifically and unequivocally refer to a "container return envelope," which they specifically describe in N.C. Gen. Stat. § 163-229. With equal specificity and clarity, the statutes require that this *container-return envelope*—and not some other "outer, return envelope"—must be sealed by the voter or sealed in his or her presence and then submitted to the county board of elections. *See id.* § 163-231(a)(3) (requiring an absentee voter to place his or her "folded ballots *in the container-return envelope and securely seal it* or have this done in the voter's presence" (emphasis added)); *id.* § 163-230.1(d) (providing that an application for an absentee ballot "shall be completed and signed by the voter personally, the ballots

---

[5] As the Numbered Memo and Declaratory Ruling continue to guide county boards of elections and, if unaddressed, will apply to future elections, this matter has not been mooted by the occurrence of the most recent elections earlier this month.

9

marked, the ballots *sealed in the container-return envelope*, and the certificate [on the sealed container-return envelope] completed as provided in G.S. 163-231." (emphasis added); *id.* § 163-231(a) (providing directions for transmitting "*the sealed container-return envelope*, with the ballots enclosed" to the county board); *id.* § 163-231(b) (describing in detail how "*[t]he sealed container-return envelope* in which executed absentee ballots have been placed shall be transmitted to the county board of elections who issued those ballots" (emphasis added)).

It makes sense that the General Assembly would require that the container-return envelope be sealed. After all, the voter must certify *on that envelope* that he or she has voted the ballot that is sealed *in that envelope. See id.* § 163-229(b)(1); *id.* § 163-230.1(d). It is that envelope that is akin to the traditional ballot box at a polling place, into which ballots were deposited and which was opened only by official elections staff when it was time to count the ballots.

Irrespective of the purpose for sealing the container-return envelope, this Court would have to rewrite the CRE Statutes if it were inclined to adopt the NCSBE's position. As shown above, there are no fewer than *four* references to the sealing of container-return envelopes in those statutes. The Court would have to, among other things, delete each of those references. Well-established canons of statutory construction, however, preclude such a judicial rewriting of statutes. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is . . . [the courts'] duty 'to give effect, if possible, to every clause and word of a statute.'"); *N.C. Dept. of Correction v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009) ("Because the actual words

of the legislature are the clearest manifestation of its intent, we give every word of the statute effect, presuming that the legislature carefully chose each word used.").[6]

**B.** **The relatively recent enactment of voter-ID laws does not change the requirement that an absentee voter must seal *the* container-return envelope.**

Attempting to explain why it issued a Numbered Memo and a Declaratory Ruling that contradict the CRE Statutes' plain language, the NCSBE points to voter-ID laws passed after the General Assembly enacted the CRE Statutes. Specifically, the NCSBE notes that the General Assembly enacted statutes requiring that absentee voters attach certain forms of voter-ID to the exterior of container-return envelopes. (NCSBE Mem. at 3.) Next, the Board observes that this voter-ID information must be kept confidential. (*Id.*) Because the information attached to the outside of the container-return envelope must be kept confidential, the NCSBE notes that an absentee voter must now enclose the container-return envelope in a separate, outer envelope. (*Id*. at 12.) As the Board explains:

> Following the implementation of the voter ID requirement, however, absentee voters must necessarily use *two* envelopes to transmit absentee ballots to their county board[s] of elections. This outcome follows inexorably from the fact that voters are now required to

---

[6] The U.S. Court of Appeals for the Fourth Circuit has held that a federal court looks to state-law canons of construction when interpreting a state statute in a diversity case, *Whitmire v. So. Farm Bureau Life Ins. Co.,* 52 F.4th 153, 157 (4th Cir. 2022), but apparently has not considered the issue in a federal-question case. It would, however, make sense to apply North Carolina canons of statutory construction when interpreting a North Carolina statute in any case. *See Batterton v. Texas Gen. Land Office*, 783 F.2d 1220, 1222 (5th Cir.), *reh'g & reh'g en banc denied*, 789 F.2d 316 (5th Cir.), *cert. denied*, 479 U.S. 914 (1986). In any event, Plaintiffs will cite both federal and state canons of construction in analyzing the General Statutes here.

11

include a photocopy of a photo ID (or a photo ID exception form) with their marked ballots. *See* N.C. Gen. Stat. § 163-230.1(f1).

(*Id.* (emphasis in original)).

All of this is well and good, but then the NCSBE makes a giant leap and argues that, "[i]t follows that to comply with all of these distinct requirements, the 'container-return envelope' must now necessarily consist of two separate envelopes." (*Id.*) A careful review of the statutes confirms that the NCSBE is wrong.

**First**, the North Carolina General Statutes plainly contemplate that each absentee voter will receive _a single_ container-return envelope that meets various specific, statutorily prescribed requirements:

> Upon receiving the completed request form [from an absentee voter], the county board of elections shall cause to be mailed to that voter _a single_ package that includes all of the following: . . . _A_ container-return envelope for the ballots, printed in accordance with G.S. 163-229. . . .

N.C. Gen. Stat. § 163-230.1(a)(2) (emphasis added); *see also id.* § 163-229(b) (describing requirements for container-return envelopes). Further emphasizing that an absentee voter is to receive and submit only *one* container-return envelope, the statutes require that an absentee voter must place his or her "folded ballots in _the_ container-return envelope and securely seal _it_ or have this done in the voter's presence." *Id.* § 163-231(a)(3) (emphasis added); *see also id.* § 163-231(d) (providing for the transmission of "_the_ sealed container-return envelope" (emphasis added)).

To adopt the NCSBE's construction of the CRE Statutes, the Court would have to ignore the statutes' plain language. Well-established canons of statutory construction prohibit such an approach. *See U.S. v. Hatcher*, 560 F.3d 222, 226 (4th

Cir. 2022) ("As a general rule, when the terms of a statute are clear, its language is conclusive and courts are not free to replace that clear language with an unenacted legislative intent." (Cleaned up.)); *North Carolina Farm Bureau Mut. Ins. Co. v. Herbert*, 385 N.C. 705, 711, 898 S.E.2d 718, 724 ("If the state's plain language is clear and unambiguous, this Court applies the statute as written and does not engage in further statutory construction."), *reh'g denied*, 900 S.E.2d 661 (N.C. 2024).

**Second**, the CRE Statutes do not say that a county board of elections must mail *two* envelopes to an absentee voter, *each of which shall constitute a container-return envelope*. They do not say that the absentee voter shall place his or her ballots in the container-return envelope and then seal *either* the container-return envelope *or* an outer envelope into which the container-return envelope is placed. Nor do they say an absentee voter may opt not to seal the container-return envelope, as long as the outer envelope is sealed.

If, at the time it enacted voter-ID laws, the General Assembly had desired to redefine the concept of the container-return envelope to encompass two separate envelopes, it could have done so by amending the statutes. It did not do that, and the NCSBE clearly lacks the power to do that. Unlike the General Assembly, the Board does not have the power to amend statutes. *See* N.C. Const., art. II, § 1 ("The legislative power of the State shall be vested in the General Assembly . . . ."); *see also Integon,* 28 N.C. App. at 11, 220 S.E.2d at 412. And a court cannot adopt the NCSBE's interpretation if it would require judicially rewriting the CRE Statutes. *See Hatcher*, 560 F.3d at 226; *Herbert*, 385 N.C. at 711, 898 S.E.2d at 724.

**Third**, the Court does not need to ignore, delete, distort, rewrite, or add to statutory language to address the NCSBE's purported concern. County boards can simply send two envelopes to absentee voters: (1) a container-return envelope that satisfies the CRE Statutes and which must be sealed; and (2) a separate, second envelope into which the sealed container-return envelope may be placed that satisfies the privacy statutes. Furthermore, the boards are required to provide absentee voters with written instructions about what to do with those envelopes. N.C. Gen. Stat. § 163-230.1. According to the NCSBE, that is exactly what is happening now. (Numbered Memo [D.E. page 3].) That approach solves the problem identified by the NCSBE and allows the Board to "harmonize" the CRE Statutes and privacy statutes. (NCSBE Mem. at 8 n.5, *id.* at 13.) Most importantly, it does not require anyone to adopt some tortured reading of the CRE Statutes that (a) redefines what constitutes a container-return envelope or (b) allows the NCSBE and county boards to ignore the statutes' plain requirement that container-return envelopes must be sealed.

## C. Contrary to the NCARA's argument, the NCSBE does not have the discretion to ignore state law.

In its "Joinder to Defendants' Motion to Dismiss," the NCARA argues that, "[n]othing in state law requires the Board to reject ballots that are placed in the container-return envelope and securely sealed in an outer envelope." (NCARA Joinder at 1.) As shown above, state law could not be any clearer about the requirement that the container-return envelope must be sealed. On the other hand, no North Carolina law grants the NCSBE, state county boards of elections, or absentee voters the discretion to decide whether to follow the CRE Statutes. That is

14

not surprising. Permitting anyone to ignore the CRE Statutes' requirements would render those statutes meaningless.  As the U.S. Supreme Court has held, "[c]asting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich v. Democratic Nat. Cmte.,* 594 U.S. 647, 669 (2021). Those rules cannot be interpreted in a manner that renders them meaningless. *See Duncan*, 533 U.S. at 174; *N.C. Dept. of Correction*, 363 N.C. at 201, 675 S.E.2d at 649.

### III.  __The Materiality Provision does not apply in this case.__

The NCSBE argues that, "the Numbered Memo's guidance is necessary to ensure that county boards of elections comply with federal law," specifically 52 U.S.C. § 10101(a)(2)(B), the "Materiality Provision" of the Civil Rights Act of 1964. The Materiality Provision provides as follows:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C.§ 10101(a)(2)(B).

The NCBSE asserts that, "[e]ven if failing to seal an inner envelope [i.e., the container-return envelope] placed inside an otherwise sealed, outer return envelope is an error under state law, it constitutes an immaterial 'error or omission on [a] record or paper relating to an[] application, registration, or other act requisite to voting.' " (NCSBE Mem. at 18 (quoting Materiality Provision).) Thus, the NCSBE contends, a voter cannot be denied the right to vote because of the error. (*Id.*) As will

15

be shown below, the NCSBE has misinterpreted the Materiality Provision. That provision does not, in fact, apply to this matter.

A. **The failure to seal the container-return envelope does not constitute "an error or omission on any record or paper."**

For the Materiality Provision to apply to a voter's error or omission, that error or omission must, among other things, be "on" a certain record or paper. The Materiality Provision "was intended to address the practice of [states] requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); *see also Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 639 (W.D. Wisc. 2021); *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004).

Consequently, the Materiality Provision requires, among other things, a showing that the error or omission upon which a state actor acts must be "on" a record or paper for the provision to apply. Courts have consistently held that a state law requiring some other form of conduct that does not involve providing some information on a record or paper is not covered by the Materiality Provision. *See, e.g., Democratic Congressional Campaign Cmte. v. Kosinski*, 614 F. Supp. 3d 20, 55 (S.D.N.Y. 2022) ("[I]t would stretch the law well beyond its plain meaning to hold that the error of casting a ballot from an incorrect polling place is an error 'on any record or paper . . . relating to any . . . act requisite to voting' of the kind that the statute contemplates."); *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 841 (S.D.

16

Ind. 2006) ("[T]he act of presenting photo identification in order to prove one's identity is by definition not an 'error or omission on any record or paper' and therefore . . . [the Materiality Provision] does not apply."), *aff'd sub. nom Crawford v. Marion Cnty. Election Bd.,* 472 F.3d 949 (7th Cir.), *reh'g & reh'g en banc denied*, 484 F.3d 436 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008); *Friedman*, 345 F. Supp. 2d at 1372 (late submission of absentee ballots falls outside the Materiality Provision's scope).

The failure to seal a container-return envelope does not amount to a failure to provide information. Not surprisingly, the NCSBE has not cited—and Plaintiffs have not found—a case to the contrary. Even judges who believe that an absentee ballot is otherwise subject to the Materiality Provision agree that whether an absentee voter properly uses such an envelope is not covered by the provision. *See, e.g., Ball v. Chapman*, 289 A.3d 1, 28 (Pa. 2023) (opinion of three justices on an evenly divided court) ("[I]t would be challenging to argue that failure to use a secrecy envelope constitutes an 'omission *on* any record or paper' as opposed to the omission *of* any record or paper." (Emphasis in original.)); *Pa. State Conf. of NAACP Branches v. Secretary Commonwealth of Pa.,* 97 F.4th 120, 148 n.17 (3d Cir. 2024) (Shwartz, J. dissenting) ("State laws that . . . require the use of a secrecy envelope for mail-in ballots . . . lie outside the sphere of the Materiality Provision, as such requirements cannot result in errors on papers requisite to voting."), *reh'g & reh'g en banc denied*, 2024 WL 3085152 (3d Cir. Apr. 30, 2024).[7]  The Materiality Provision does not apply.

---

[7] The majority agreed that "secrecy envelopes" are not "are covered by . . . the Materiality Provision because they do not involve "record[s] or paper[s]." *Id.* at 136.

### 1. **The NCSBE's cited cases are inapposite.**

Each one of the three cases cited by the NCSBE in support of its Materiality Provision that involved the question of whether the rejection of a ballot for the failure to provide certain information would violate the provision. None involved the act of sealing an envelope. *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018), *reconsideration denied*, 2018 WL 9943564 (N.D. Ga. Nov. 15, 2018), involved the failure to write the voter's correct birth year on an absentee ballot envelope. *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1267-68, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006), concerned the failure to write a voter's full social-security number on a voter registration application. Finally, *Ford v. Tenn. Senate*, No. 06-2031 DV, 2006 WL 8435145, at \*10-11 (W.D. Tenn. Feb. 1, 2006), *appeal dismissed sub. nom Ford v. Wilder*, 469 F.3d 500 (6th Cir. 2006), pertained to a failure to provide a signature on an application for a ballot and in a poll book.

### 2. **The NCARA's argument is specious.**

In its Joinder to the Motion to Dismiss, the NCARA mischaracterizes Plaintiffs' argument in a specious attempt to show that the issue identified by Plaintiffs is an error that falls within the scope of the Materiality Provision's "on any record or paper" requirement. Specifically, the NCARA argues that, "[t]he thrust of Plaintiffs' Complaint is that a ballot sealed within an outer envelope should not count because the outer envelope does not include the information or certifications required by N.C.G.S. § 163-229(b)." (NCARA Mem. at 1.) This is incorrect.

**First**, this case is not about whether an absentee voter's failure to include information on the outside of the outer envelope could serve as a legal reason to reject

18

the ballot inside. It is about the failure to seal ballots in a container-return envelope and then submit that sealed envelope to a county board of elections. Plaintiffs are assuming, for purposes of this case, that the applications on the container-return envelopes at issue are correctly and completely filled out. Furthermore, Plaintiffs are not suggesting that an absentee voter must provide any of the information required for a container-return envelope on some other, outer envelope.

**Second**, even if it were Plaintiffs' contention that the failure to include information on the outer envelope was the issue in this case, that would not change the outcome. This is because, as will be shown below, the Materiality Provision does not apply to state ballot-casting rules such as North Carolina's rules requiring absentee voters to provide the information required by the CRE Statutes.

B. **Because the sealing of the container-return envelope is not part of the process for determining whether a voter is qualified to vote, the Materiality Provision is not implicated in this case.**

1. **The Materiality Provision addresses the stage in the voting process when a state determines whether a person is qualified to vote.**

According to its plain language, the Materiality Provision covers only errors or omissions made on records or papers that are "material *in determining* whether . . . [an] individual is *qualified* under State law to vote." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). "By using the words 'in determining,' Congress was expressing its intent that the Materiality Provision applies only when the state is 'determining' whether a person is qualified to vote." *Liebert v. Millis*, No. 23-cv-672-jdp, 2024 WL 2078216, at *13 (W.D. Wisc. May 9, 2024) (cleaned up). "The phrase 'qualified under State law' is defined in § 10101(e): 'the words "qualified under State law" shall mean

19

qualified according to the laws, customs, or usages of the State.' " *Common Cause*, 574 F. Supp. 3d at 639 (quoting 52 U.S.C. § 10101(e)).

The process of determining whether a person is qualified to vote occurs at the earliest stage in the voting process, when a person first registers to vote. *See Pa. State Conf. of NAACP Branches v. Secretary Commonwealth of Pa.,* 97 F.4th 120, 129-30 (3d Cir. 2024), *reh'g & reh'g en banc denied*, 2024 WL 3085152 (3d Cir. Apr. 30, 2024) ("*Pa. NAACP*").[8] The process is separate and distinct from the later stage in the voting process when a duly registered voter casts his or her ballot—whether in-person or by absentee ballot. *Id.* at 129-30. Consequently,

> the information containing an error or omission, material or not, must itself relate *to ascertaining a person's qualification to vote* (like paperwork submitted during voter registration), and *it is only in that context* that officials are prohibited from using a mistake to deny ballot access unless it is material in determining whether the applicant is indeed qualified to vote.

*Pa. NAACP*, 97 F.4th at 131 (cleaned up; emphasis added).[9]

That the Materiality Provision focuses on state restrictions related to the stage of the voting process when a voter registers to vote is confirmed by the statutory text that immediately precedes and follows the Materiality Provision in 52 U.S.C. § 10101(a)(2). *See Pa. NAACP*, 97 F.4th at 131; *Liebert*, 2024 WL 2078216, at *13. Subsection 10101(a)(2)(A), which immediately precedes the Materiality Provision,

---

[8] The losing parties in *Pa NAACP* have petitioned the Supreme Court for a writ of certiorari, but the Supreme Court apparently has yet to rule on the petition.

[9] This is another reason why the *Ford* and *Schwier* cases cited by the NCSBE do not support the Board's position; both cases involved errors or omissions that occurred *during voter registration*, not during the casting of an absentee ballot. *See Ford*, 2006 WL 8435145, at *10-11; *Schwier*, 412 F. Supp. 2d at 1267.

"targets the application of discriminatory standards, practices, or procedures 'in determining whether any individual is qualified to vote.' " *Pa. NAACP*, 97 F.4th at 131 (quoting § 10101(a)(2)(A)). Subsection (a)(2)(C), which immediately follows the Materiality Provision, "bars literacy tests 'as a qualification for voting,' " subject to certain exceptions. *Id.* (quoting § 10101(a)(2)(C)). "It is unlikely that Congress would 'sandwich' a broad provision governing all aspects of voting in between two provisions focusing on determining voter qualifications." *Liebert*, 2024 WL 2078216, at *13. To the contrary, "[t]he thrust of subsection (a)(2)," which is located between these two subsections, "thus appears clear: it governs voter qualification determinations." *Pa. NAACP*, 97 F.4th at 131.

Finally, even the Materiality Provision's "legislative history shows . . . Congress was concerned with discriminatory practices during voter registration . . . in line with what the text reflects." *Pa. NAACP*, 97 F.4th at 133. While that history contains "numerous statements . . . focused on the problem of elections officials disqualifying Black voters because of minor mistakes on registration forms and applications," it offers "no examples of concerns . . . about rejecting ballots or ballot envelopes for being filled out incorrectly." *Liebert*, 2024 WL 2078216, at *13.

### 2. North Carolina officials do not determine whether an absentee voter "is qualified under State law to vote" based on whether the voter's container-return envelope is sealed or unsealed.

North Carolina has separate bodies of rules for separate stages of voting. In the first stage, a voter must establish that he or she is qualified to vote and register to vote. The statutes governing voter qualification and registration are found in

21

Subchapter III of Chapter 163 of the North Carolina General Statutes. *See* N.C. Gen. Stat. §§ 163-54 to 163-91; *see also id.* §§ 163-54 to 163-59 (voter qualification); *id.* §§ 163-82.1 to 163-82.28 (voter registration).

Under N.C. Gen. Stat. § 163-54 and § 163-55(a), only North Carolina residents, born in the United States or naturalized, over 18 years old, registered to vote, and not felons may be qualified to vote. To register to vote, a person completes "an application form for voter registration," *id.* § 163-82.3(a)(1), on which the voter provides certain statutorily required information about him- or herself, *id.* § 163-82.4, and then submits the application form to his or her county board of elections, *id.* § 163-82.6.[10] Once the application form is submitted, the county board of elections determines whether the applicant is, in fact, qualified to vote, *id.* § 163-82.7(a)(1) & (c), and if so, registers the voter, *id.* § 163-82.7(d). This is the part of the voting process in North Carolina that is focused on "determining whether . . . [an] individual is qualified under state law to vote." 52 U.S.C. § 10101(a)(2)(B); *see Pa NAACP*, 97 F.4th at 129-30, 135; *Friedman*, 345 F. Supp. 2d at 1372-73.

A second, separate stage in the voting process in North Carolina governs the casting of ballots. Relevant here, Subchapter VII of Chapter 163 provides the rules for casting absentee ballots. *See* N.C. Gen. Stat. §§ 163-226 to 163-258.31. As discussed above, North Carolina's voting qualification and registration rules are used to determine whether an absentee voter is qualified to vote. Once that initial

---

[10] N.C. Gen. Stat. § 163-82.6B provides for same-day registration and still requires a voter to complete "a voter registration application form." *Id.* § 163-82.6B(b)(1).

determination is made, there is no need to do so again, and ballot-casting rules, like the CRE Statutes, do not in fact, attempt to determine whether a voter is qualified. *See Liebert*, 2024 WL 2078216, at *14 ("At the time voters are preparing and casting their ballots, they have already been deemed qualified, so there would be no reason to reevaluate their qualifications again."); *see also Friedman*, 345 F. Supp. 2d at 1371.

As for the issue in this case: There is nothing about the requirement that a container-return envelope be sealed that would be used to determine whether the absentee voter who submitted the ballot inside the envelope was qualified to vote. A county board of elections would be unable to "determine" from the fact a container-return envelope was sealed or unsealed whether the absentee voter submitting that envelope has satisfied <u>all</u> the qualifications to vote—i.e., born in the United States, naturalized, North Carolina resident, over 18 years old, registered to vote, and not a felon. Thus, North Carolina's laws requiring that container-return envelopes be sealed do not fall within the Materiality Provision's ambit.

### C. <u>The container-return envelope is not a record or paper "relating to any application, registration, or other act requisite to voting."</u>

#### 1. <u>It is not a record or paper "relating to any application" covered by the Materiality Provision.</u>

The NCSBE notes that the Materiality Provision covers errors or omissions on certain records or papers "relating to any application, registration, or other act requisite to voting." (NCSBE Mem. at 18.) The NCSBE then argues that, because the North Carolina General Statutes use the term "application" when describing the form that must be completed on container-return envelopes, the envelopes must fall within the Materiality Provision's scope. (*Id.*) This overly simplistic argument is wrong.

The "application" on the outside of a container-return envelope is not the kind of application to which the Materiality Provision refers. As explained above, the "application" to which the Materiality Provision applies is an application used to determine if the voter is "qualified to vote." The only "application" that North Carolina uses to determine whether a voter is "qualified to vote" is, however, the "application form for voter registration" described above. *See* N.C. Gen. Stat. §§ 163-82.3, 163-82.4, 163-82.6, 163-82.6B(b)(1), 163-82.7(a).

It is plain from the absentee-ballot statutes' text that the "application" on the outside of the container-return envelopes is simply an application to cast an absentee ballot, not an application to register to vote. The absentee-ballot application does not ask, for example, if the voter was born in the United States, has been naturalized, is over 18 years of age, or is a felon. *See* N.C. Gen. Stat. § 163-229(b). Nor does any statute require a county board of elections to ascertain whether a voter is qualified at this stage in the voting process. Indeed, the General Assembly has made it clear that to even request an absentee ballot, a person must *already be a qualified voter*: "A qualified voter who is eligible to vote by absentee ballot . . . shall complete a request form for an absentee application and absentee ballots . . . ." N.C. Gen. Stat. § 163-230.1(a); *see also Friedman*, 345 F. Supp. 2d at 1371 ("Nothing . . . indicates that [the Materiality Provision] . . . was intended to apply to the counting of ballots by individuals *already deemed qualified to vote*." (Court's emphasis.)).

### 2. The container-return envelope is not a "record or paper relating to any . . . other act requisite to voting."

### a. An "other act requisite to voting."

The NCSBE also argues that, "[t]he approval of the application [on the outside of the container-return envelope] is requisite to casting a person's vote." (NCBSE Mem. at 18.) Even assuming, for argument's sake, that the NCSBE is correct, the issue in this case is not whether the application on a container-return envelope has been approved; it is whether the envelope has been sealed. Also, the Materiality Provision does not apply to acts "requisite *to casting a person's vote*." It applies to certain acts "requisite *to voting*." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

Pursuant to well-established canons of statutory construction, the phrase "other act requisite to voting" "must be read in [the] context of the list in which it is included." *Liebert*, 2024 WL 2078216, at *13. As the Supreme Court has held, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (cleaned up). The terms "registration" and "application" preceding the phrase "other act requisite for voting" in the Materiality Provision "are both processes for determining voter qualifications." *Liebert*, 2024 WL 2078216, at *13. "It follows that the phrase 'other act requisite to voting' also refers to processes for determining voter qualifications." *Id.* "Th[e] specific words [i.e., registration and application] limit the scope of the relevant paperwork in a way that coheres with the . . . [Materiality Provision's] voter qualification focus." *Pa. NAACP*, 97 F.4th at 132.

Furthermore, the phrase "or other act requisite to voting" serves a purpose other than broadening the Materiality Provision to cover the act of "casting a person's vote." Instead, the phrase "prevents government officials from creating a new voter qualification process and avoiding the requirements of the Materiality Provision simply by calling the process something besides 'registration' or 'application.'" *Liebert*, 2024 WL 2078216, at *15. It thereby "serves as a sort of fail-safe against manipulation by election officials." *Id.*[11]

### b.  The definition of "vote."

The NCSBE notes in a footnote (NCSBE Mem. at 17 n.7.) that another part of 52 U.S.C. § 10101 defines "vote" broadly to include "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(e). But, for several reasons, it does not follow from the statute's definition of "vote" that an "other act requisite to voting" includes the casting of an absentee ballot, much less the sealing of a container-return envelope. *See Liebert*, 2024 WL 2078216, at *12 ("[T]he definition of 'vote' does not provide the obvious answer to construing the scope of the Materiality Provision.").

---

[11] Based on previous filings in this case, Plaintiffs anticipate an argument on reply that limiting the Materiality Provision to papers relating to the initial registration phase of the voting process would render the phrase "or other act requisite to voting" meaningless. As shown above, however, (1) the Materiality Provision's use of the terms "application" and "registration" provides context for the phrase "other act requisite to voting" and (2) the phrase also can be read to provide a safeguard against improper conduct related to registration. Thus, Plaintiffs' interpretation of the provision does not reduce "other act requisite to voting" to surplusage. *See Liebert*, 2024 WL 2078216, at *14-15 (rejecting a surplusage argument).

**First**, "the Materiality Provision does not apply to a record or paper related to a person's '*vote*'; it applies to a record or paper related to an 'act requisite to *voting*.'" *Liebert*, 2024 WL 2078216, at *11 (emphasis added).

**Second**, Even assuming that Congress intended that the words "vote" and "voting" would have the same scope, "a broad definition of what qualifies as 'voting' implies a *narrower* definition of what qualifies as an 'act requisite to voting.' The same act cannot be both 'voting' and 'something necessary for voting' at the same time." *Liebert*, 2024 WL 2078216, at *11. Congress did not enact a statute covering records and papers related to an "other act of voting." It enacted a statute covering certain "other act[s] *requisite to* voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Courts are not free to disregard Congress's use of the phrase "requisite to" when interpreting the Materiality Provision. *See Duncan*, 533 U.S. at 174.

**Third**, Congress actually included the word "voting" within 52 U.S.C. § 10101(e)'s definition of the word "vote," "so Congress must have meant the words to mean different things in different contexts." *Liebert*, 2024 WL 2078216, at *12. Even in cases where Congress has used the *same* word in two different parts of an act,

> [the] presumption that identical words used in different parts of the same act are intended to have the same meaning . . . . readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.

*Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004) (cleaned up).

## D. The rejection of an unsealed container-return envelope does not "deny the right of any individual to vote."

Finally, the Materiality Provision does not apply in this case because it only

27

applies in cases in which, among other things, a voter is "den[ied] the right . . . to vote." 52 U.S.C. § 10101(a)(2)(B). A voter is not, however, denied the right to vote when his or her absentee ballot is rejected due to a failure to comply with a state ballot-casting rule. *Pa. NAACP*, 97 F.4th at 133-34. The voter still possesses the right to vote; he or she has just forfeited that right by failing to comply with a ballot-casting rule that applies equally to all absentee voters. *See Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting from denial of stay). And voters do not have a "right" to have a defective ballot counted. *See Pa. NAACP*, 97 F.4th at 133 ("[W]e know no authority that the 'right to vote' encompasses a right to have a ballot counted that is defective under state law."). Indeed:

> It cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under . . . [the Materiality Provision]. Otherwise, virtually every rule governing how citizens vote would . . . [be] suspect.

*Vote.org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022).

Ballot-casting rules are distinct from rules governing whether a voter is qualified in the first instance to cast a ballot. The two sets of rules "serve entirely different purposes." *Pa. NAACP*, 97 F.4th at 136. As noted above, "[c]asting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich*, 594 U.S. at 669. And the county board of elections is required to provide written instructions to absentee voters on how to follow those rules. N.C. Gen. Stat. § 163-230.1(a)(3).

Ballot-casting rules promote states' "legitimate interests in regulating the voting process and in imposing restrictions on voters to preserve 'the integrity and

reliability of the electoral process.' " *Pa. NAACP*, 97 F.4th at 133 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-90 (2008)); *see Liebert*, 2024 WL 2078216, at *13 ("[B]allot-casting rules are about protecting the integrity of the voting process."); *see also Kennedy v. N.C. State Bd. of Elec.*, __ N.C. __, 905 S.E.2d 55, 56 (2024) ("Since 1776 the state constitution [of North Carolina] has recognized the importance of elections and their integrity in the Declaration of Rights"). State interests may include, among other things, "deterring voter fraud, undue influence, and ballot harvesting." *Liebert*, 2024 WL 2078216, at *16.[12]

Consequently, states "have broad powers to determine the conditions under which the right of suffrage may be exercised," *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969), including "substantial authority over the time, place, and manner of voting," *Liebert*, 2024 WL 2078216, at *16 & n.13. The Materiality Provision's plain language simply does not reflect an intent by Congress to preempt that power and regulate all ballot-casting rules. *Liebert*, 2024 WL 2078216 at *16 ("If Congress had intended to displace state authority as significantly as the plaintiffs suggest, surely there would be clearer indication of that in the text or history of the statute.").

Here, it is readily apparent that the CRE Statutes are intended to prevent someone from tampering with an absentee voter's ballot between the time the ballot

---

[12] As the Supreme Court has held, "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzales*, 549 U.S. 1, 4 (2006) (per curiam).

29

is executed and when it is ultimately counted by the county board of elections. After all, the CRE Statutes require that an absentee voter mark a ballot and then place that ballot "in the container-return envelope and securely seal it or have this done in the voter's presence." N.C. Gen. Stat. § 163-230.1(d). And the voter and witnesses sign that sealed container-return envelope, which remains sealed through transmission to the county board of elections. *Id.* §§ 163-229(b), 163-231(a), 163-231(b). By requiring that the container-return envelope is signed and then sealed by the voter or in his or her presence, the CRE Statutes make it more difficult for someone to tamper with a ballot and easier to detect tampering based on a broken seal.[13] The Materiality Provision simply does not apply to such state ballot-casting rules, designed and enacted to protect the integrity of elections in North Carolina.

## CONCLUSION

For the reasons discussed above, the Court should deny the Motion to Dismiss. If the Court is inclined to dismiss this case, however, Plaintiffs respectfully request that they be given leave to amend their Complaint to address any issues with the pleading identified by the Court. *See Carolina Power & Light Co. v. 3M Co.,* No. 5:08–CV–460–FL, 2010 WL 2837009, at *2 (E.D.N.C. July 19, 2010) ("In light of the federal policy of deciding cases on the basis of substantive rights rather than pleading technicalities, a district court generally should not dismiss a complaint pursuant to

---

[13] Incredibly, the Numbered Memo actually advises that a county board can count an absentee ballot returned in a container-return envelope "which appears to have been opened and resealed." (D.E. 1-4 page 3.) In other words, according to the NCSBE, the board is free to ignore this evidence of possible tampering.

Rule 12(b)(6) without permitting a claiming party leave to amend."); *see also* Fed. R.

Civ. P. 81(2) (allowing the court to order repleading after removal).

Respectfully submitted, this the 20th day of November 2024.

/s/ Thomas G. Hooper
Thomas G. Hooper
Baker, Donelson, Bearman,
Caldwell & Berkowitz, P.C.
101 South Tryon Street, Suite 3600
Charlotte, NC  28280
Ph:  (980) 256-6300
thooper@bakerdonelson.com
N.C. State Bar No. 25571

John E. Branch III
Baker, Donelson, Bearman,
Caldwell & Berkowitz, P.C.
2235 Gateway Access Point, Suite 220
Raleigh, NC 27607
Ph: (984) 844-7900
jbranch@bakerdonelson.com
N.C. State Bar No. 32598

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send electronic notification of the filing to all counsel who have filed notices of appearance in this case.

This, the 20th day of November 2024.

/s/ Thomas G. Hooper
Thomas G. Hooper
Baker, Donelson, Bearman,
Caldwell & Berkowitz, P.C.
101 South Tryon Street, Suite 3600
Charlotte, NC 28280
Phone: (980) 256-6300
thooper@bakerdonelson.com
N.C. State Bar No. 25571

*Attorney for Plaintiffs*